UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | |
|---|---|
| Michael Maiolo, individually and on behalf of all others similarly situated, | 2:22-cv-01770-WSH |
| Plaintiff, | |
| - against - | First Amended Class Action Complaint |
| BRP US Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1. BRP US Inc. ("Defendant") manufactures the three-wheeled motorcycle known as the Can-Am Ryker ("Product").



2. Riders of the Ryker and other three-wheel motorcycles prefer it to a two wheel motorcycle for several reasons.

3. This includes greater comfort from more seating space, increased stability and easier maneuvering.

4. The result is that riders can take longer, farther rides, even for overnight trips.

5. However, the growing popularity of three-wheeled motorcycles has coincided with a historic increase in motorcycle theft, according to Bloomberg BusinessWeek.

6. The reasons include the Coronavirus pandemic, thrill seeking incited by social media and the removal of bail requirements for non-violent offenses.[1]

7. This is confirmed by the Pennsylvania State Police, which is called to investigate motorcycle theft even though the brazen criminals quickly ride the stolen bikes away.[2]



8. Insurance analysts, along with EasyBlock, an Italian company specializing in anti-theft devices for motorcycles, confirm that motorcycles are over ten times more likely to be stolen than a standard four-wheel automobile for multiple reasons.[3]

---

[1] Hannah Elliott, Motorcycle Theft Has Skyrocketed. Here's How to Keep Your Bike Safe. July 26, 2021; National Insurance Crime Bureau (NICB) Motorcycle Thefts Surge By 30 Percent In 2020
[2] Fox29 Staff, PSP: Search underway for suspects accused of stealing motorcycles worth more than $15K in Montgomery County, Jan. 24, 2023.
[3] EasyBlock, How easy is it to steal a motorcycle?, Oct. 14, 2022.

9. First, because motorcycles lack windows, a criminal will not need to break glass and draw attention to themselves while stealing it.

10. Second, because cars are more expensive on average, they are equipped with more advanced security features.

11. Third, because cars are larger, they can incorporate more durable and resilient anti-theft features in their interior locking mechanisms.

12. Fourth, criminals who steal motorcycles will serve less time in jail than those who steal cars, because the higher values of cars means a higher level of felony with longer sentences.

13. A motorcycle thief only needs a flat-head screwdriver and something to press the pins inside the locking mechanism before they are able to jumpstart the engine and ride away.

14. For these reasons, the anti-theft systems on motorcycles have been one of the most important features companies try to address.

15. However, the Ryker vehicles are marketed and sold as equipped with an anti-theft system known as Radio Frequency Digitally Encoded Security System ("RF D.E.S.S." or "DESS"), shown on the specification sheet on its website and in the Operator's Manual.

| SAFETY & SECURITY | |
| --- | --- |
| SCS | Stability Control System |
| TCS | Traction Control System |
| ABS | Anti-Lock Braking System |
| Anti-theft System | Digitally Encoded Security System (D.E.S.S.™) |
| HHC | Hill Hold Control |



16. According to the manual Plaintiff and buyers received with their Rykers, "Two RF D.E.S.S. keys are delivered with the vehicle."

17. The DESS key "contains an electronic circuit including a specifically pre-programmed chip that is read via radio frequency by the immobilizer system to allow starting the engine."

18. This functions as a significant deterrent to theft because a criminal will not be able to start the vehicle and drive it away.

19. Even if a criminal physically removes the Ryker in the back of a van, the inability to circumvent the DESS means they will be unable to start or use it.

20. The result is that criminals will increasingly seek "softer" targets for theft, and avoid trying to steal Rykers.

21. That Plaintiff and consumers expected to receive two DESS keys with their vehicles

is confirmed through review of the four page checklist they receive.



22. The third row in the section titled "Final Inspection" on page two of the checklist purchasers receive states, "RF D.E.S.S. key programmed (both keys)," with a checkmark in the

5

adjoining box.



23. While Plaintiff and purchasers received DESS keys, these were not pre-programmed and linked to their specific Ryker engines through chips and circuitry.

24. Instead, these DESS keys were based only on a magnet.

6





25. The result is that the DESS keys provided with the Ryker vehicles were non-functional because any magnet can unlock the vehicle's ignition.

26. Without a functional DESS key, a criminal can also defeat the parking brake lock (red) through a flat tool twisted into the key tumbler and bolt (yellow).



27. According to one Ryker buyer, "[Defendant] wanted to get the bikes out as fast as possible, so didn't wait for the [global] 'chip shortage' to be resolved."

28. When customers contacted Defendant about the failure to provide them DESS keys, they were told it was a warranty-related issue they should take up with their dealerships.

29. However, the dealerships tell customers that the lack of a DESS key is something that only Defendant can address.

30. The cost of insuring the vehicles was higher than it otherwise would have been due to their sale without any anti-theft system beyond the parking brake lock.

31. Plaintiff and Ryker purchasers were unable to use their vehicles as extensively as they had planned because it lacked functional DESS keys.

32.     When Ryker owners want to buy an extra or replacement DESS key, Defendant charges $239.99, shown on its website below.



33.     When Plaintiff and Ryker purchasers paid upwards of ten thousand dollars for their vehicles, two DESS keys were included, which have a retail price of $480.00.

34.     Defendant overcharged Plaintiff and other Ryker purchasers by at least $480.00 when it promised them two DESS keys but provided non-functional DESS shells which operated not by a chip that was pre-programmed and linked to their engines, but by a magnet.

35.     Social media contains numerous instances of Ryker users who, like Plaintiff, were charged for functional DESS keys, yet did not receive them.

Jurisdiction and Venue

36.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

37.     The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

38.     Plaintiff is a citizen of Pennsylvania.

39.     Defendant is a Delaware corporation with a principal place of business in Wisconsin.

40.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

41. The members of the class Plaintiff seeks to represent are more than 100, because Defendant has sold thousands of vehicles without DESS keys across the States covered by the proposed classes.

42. Venue is in this District with assignment to the Pittsburgh Division because a substantial part of the events or omissions giving rise to these claims occurred in Allegheny County, including Plaintiff's purchase and use of the Product, exposure to and reliance on the representations, and his awareness that they were misleading.

## Parties

43. Plaintiff Michael Maiolo is a citizen of Pittsburgh, Allegheny County, Pennsylvania.

44. Defendant BRP US Inc. is a Delaware corporation with a principal place of business in Sturtevant, Racine County, Wisconsin.

45. Its parent company, Bombardier Recreational Products Inc., is a Canadian corporation, and the world's leading seller of recreational vehicles, with an industry-wide reputation for innovation and security.

46. Defendant sells the Ryker and other similar vehicles through a network of dealers, which follow its instructions regarding the final checklists given to buyers like Plaintiff.

47. Defendant instructed its dealers to check the box next to the DESS keys in the checklist, and directed the dealers to provide DESS keys without chips that were pre-programmed, but based on magnets.

48. The dealers lacked authority to distribute the DESS keys based on magnets, not chips, to Plaintiff and other buyers, without Defendant's explicit authorization.

49. If the dealers failed to follow Defendant's instructions for completing the sale of the Rykers, which included delivering non-functional DESS keys, they could have their dealership

rights forfeited.

50. As a result of the false and misleading representations, the Rykers are sold for no less than $8,999, excluding add-on charges, tax and sales.

51. Plaintiff paid over fourteen thousand dollars for his Ryker in 2022 and expected it would come with a DESS key that was functional, pre-programmed to connect to his engine based on a chip and circuitry, not by a magnet.



52. Plaintiff expected it would come with DESS keys that were pre-programmed through using a chip and electronic circuitry to control access to the engine, because he relied on the Ryker website, written materials supplied by Defendant to its dealers which he viewed, the specifications sheet and the Operator's Manual and the checklist he received, which stated the Ryker came with functional DESS keys.

53. Plaintiff was unable to use his vehicle in the manner he expected because, for instance, he could not leave it anywhere unattended, lest it be stolen.

54. Plaintiff was overcharged by at least the retail price of two DESS keys, sold by Defendant for $480.00, excluding tax.

55. Plaintiff relied on the words, descriptions, statements, omissions, claims, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

11

56. Plaintiff paid more than he would have paid, and at least $480.00 more, had he known it would not be delivered with the promised security system, or would not have purchased it.

57. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

58. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their anti-theft systems.

59. Plaintiff intends to, seeks to, and will purchase other Ryker vehicles when he can do so with the assurance they are provided with the promised anti-theft systems.

60. representations are consistent with its abilities, attributes, and/or composition.

61. Plaintiff is unable to rely on the anti-theft representations not only of Defendant's recreational vehicles, but those of competitors, because he is unsure whether those representations are truthful.

62. If Ryker's representations were to be truthful with respect to their DESS system, Plaintiff could rely on the representations made by other companies about their anti-theft systems.

### Class Allegations

63. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Pennsylvania Class:** All persons in the State of Pennsylvania who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Kansas, Minnesota, Mississippi, North Dakota, West Virginia, Utah, Montana, Idaho, Georgia, Kentucky, Iowa, and Alaska who purchased the Product during the statutes of limitations for each cause of action alleged.

64. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled

to damages.

65. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

66. Plaintiff is an adequate representative because his interests do not conflict with other members.

67. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

68. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

69. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

70. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"),
73 Penn. Stat. Ann. §201-1, *et seq.*
(Pennsylvania Class)</u>

71. Plaintiff incorporates by reference all preceding paragraphs.

72. Plaintiff expected the Product would be supplied to him with the promised DESS system.

73. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

74. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)</u>

75. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are

similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

76. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

77. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, which they did, suffering damages.

## Breach of Contract

78. Plaintiff entered into a contract with Defendant or its authorized agents to buy the Product.

79. The terms of the contract required that he be provided with DESS keys for the vehicle following his payment of monies to Defendant.

80. After Plaintiff paid for the Product, he received the vehicle with non-functional DESS keys, not based on chips and circuitry, but on a magnet.

81. The failure to provide the DESS keys was a breach of the contract, entitling Plaintiff to damages.

## Breaches of Express Warranty, Implied Warranty of Merchantability/Fitness for a Particular Purpose and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

82. The Product was manufactured, identified, marketed, distributed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it would be supplied with the promised DESS system.

83. The anti-theft system was an essential part of the vehicle bought by Plaintiff and class members.

84. Defendant directly marketed the Product to Plaintiff through its advertisements and

marketing, through various forms of media, product descriptions distributed to resellers, and targeted digital advertising.

85. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing to directly meet those needs and desires.

86. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant it had a robust anti-theft system which was convenient to use.

87. Defendant's representations affirmed and promised that the Product would be supplied with the promised DESS system.

88. Defendant described the Product so Plaintiff believed it would be supplied with the promised DESS system, which became part of the basis of the bargain that it would conform to its affirmations and promises.

89. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

90. This duty is based on Defendant's outsized role in the market for this type of Product, the leading seller of street legal recreational vehicles.

91. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

92. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties.

93. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

94. The Product did not conform to its promises or affirmations of fact due to

Defendant's actions.

95. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made in marketing or advertising, because it was marketed as if it would be supplied with the promised DESS system.

96. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it would be supplied with the promised DESS system, which would allow him to take the vehicle more places and park it safely, not having to be concerned about its vulnerability to theft.

Negligent Misrepresentation

97. Defendant had a duty to truthfully represent the Product, which it breached.

98. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in the area of recreational vehicles.

99. Defendant's representations and omissions went beyond the specific representations made in marketing, and incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that Bombardier has been known for.

100. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

101. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

102. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, his purchase of the Product.

<u>Fraud</u>

103. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it would be supplied with the promised DESS system.

<u>Unjust Enrichment</u>

104. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory and/or punitive damages and interest;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5. Other and further relief as the Court deems just and proper.

Dated:   May 1, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com